Good morning, Your Honors. Mark Hanover on behalf of Defendant Appellant Allstate. The crux of Plaintiff's Liability Theory is that Allstate policyholders were allegedly over-insured because they paid homeowners' premium on square footage that allegedly did not exist. But Ms. Hilario does not fit the Plaintiff's Liability Theory because the square footage of her home recorded in Allstate's records was in fact lower than the actual square footage. Counsel, I remember reading that in your brief. But I also take it from the brief that Allstate, this was all an estimate. Nobody ever used exact square footage. That's right. So if the basis for the complaint was an improper use of an estimate, what does the actual square footage in Ms. Hilario's home have to do with it? Allstate doesn't write partial homeowners' insurance. Allstate will only write homeowners' insurance that it believes is sufficient to replace the home in the event that it's completely destroyed. Right. So Allstate uses tools to try to figure out how much insurance might be necessary. Allstate discloses to the policyholder, here is our estimate, our estimated replacement cost of what we believe. And I respect that. My question, though, is since Allstate sets its premium based upon what it believes to be a good faith estimate, but in this case you're saying, well, we'll put the estimate aside. The actual square footage based upon, what was it, some kind of aerial surveillance or something you did at her home. Yes. It's less. And she actually came out better. Yes. But the complaint talks about the estimate. And she claims in the complaint that her bill was based upon the estimate, not based upon the actual square footage. So I'm still puzzled as to why your estimate of the, not your estimate, your measurement of the actual square footage has anything to do with this class action and her standing as the representative. The relief that the plaintiff, the plaintiff is not complaining about an improper estimated replacement cost. She doesn't care what the estimated replacement cost is. The relief that the plaintiff is seeking under the UCL is return of premium. That's $141 or something like that. But that's based upon, if I understand it, it's based upon her belief that she was kind of double counted based upon the use of the new, I forget the acronym for it, TC something or other. Isn't that correct? The reason why she wants return of premium is because she believes that the premium, because she was over, she believed she was over-insured. Well, she's not complaining about being over-insured. She's complaining about paying more money than she would have otherwise. Did she pay more money than she would have otherwise? I think the answer is conceded to be yes. Am I wrong about that? She paid. Did she pay more than she would have paid otherwise? If Allstate didn't do this examination of her house out of the blue, it did it because they were trying to figure out how to deal with this lawsuit. If the lawsuit had never been there, she would never have paid the higher amount of, and the error hadn't taken place, she wouldn't have paid the higher amount of premium, would she? I mean, I don't think there's a dispute about that. Right. There's no dispute about the premium she paid. Was any claim ever paid on this policy? I don't believe so. Okay. So she paid more than she would have otherwise. Why isn't that an injury? You're talking about she got extra value somehow because she was overinsured for some period of time and so forth, but no claims were ever paid. So from a dollars and cents perspective, she paid more money than she would have otherwise. And it doesn't sound like that's factually disputed. She paid more money because she didn't disclose the actual square footage of her home. Are you going to sue her for that? No. Okay, then. Then what's the problem? I mean, I'm having real trouble understanding how this action by Allstate, which it appears to concede happened not just to this plaintiff but to the other members of the class for whom this back-and-forth counting resulted in a double counting, is being resisted so hard if factually it's not disputed that, in fact, Allstate made a mistake at a certain point in time, tried to correct the mistake but overlooked the fact that for many of the homeowners and the insureds, the mistake had been manually corrected by agents or other people. Those are the people we're talking about here. Now, isn't it the case that those people paid more than they would have otherwise? Well, there's what happened to Ms. Hilario and then there's what happened to everyone else. And that's why I've just generally, because I'm going to leave her out of it for the moment, is there any dispute that the insureds generally, leaving aside the aberration for her addition that never got picked up, that they paid more money than they would have otherwise? Well, not — I mean, it depends — not on the class that the plaintiff sought to certify. The plaintiff sought to certify the class of everyone who had a Project QI. And the district court caught that and changed the definition. That's the group I'm talking about. But, okay, for that group, what the judge said, that it includes everyone where there was a garage that was allegedly double-counted. But we cannot figure out what that actually means. For example, with respect to Hilario, all stay reduced by 288 square feet, which is a standard garage, and then all stay increased by 288 square feet, which is a standard garage. In the intervening time, Hilario, she noticed the decrease. She increased by 125 square feet — excuse me, 150 square feet. That's not the size of her garage, and that's not the size of a standard garage. We found out later in the litigation the size of her garage is 249 square feet. So was her garage double-counted? You're not asking — you're not answering Judge Clifton's question. He's asking about the class as redefined by the judge. Okay, well, I — Please answer his question. My question is really — I'm having trouble understanding why Allstate isn't trying to fix the problem, which it has the responsibility for having created and has the best source of information for who actually suffered from this. I mean, the lawsuit here seems like an expenditure of resources that could be better applied in solving the admitted problem for some number of Allstate policyholders. We don't know that there's — and the record before the court does not prove that there's a problem for any Allstate policyholders because the only one that's before the court is Ms. Hilario, whose limits weren't too high. She didn't have too much coverage. Okay, so you're not really interested in addressing the problem that Allstate has conceded, which is that it made a correction that turns out to have overcorrected for some number of people where there had been an interim correction. Okay, let's go ahead and get to Ms. Hilario. I mean, I've put it in front of you two or three times, and I don't hear anything that suggests that Allstate's trying to address that problem. We did, Your Honor. We sent letters to people telling them to review and verify the information regarding your insured property, to notify us immediately if you believe that any information on your policy declarations is incorrect. But the problem is we can't tell that from our records. Our records will tell whether or not the square footage of a home increases at some point or another, but we don't know why that square footage was increased. We don't know why Ms. Hilario's agent increased by 150 square feet. That doesn't match up to anything. There's many reasons. You know it was increased. You know that you did one adjustment and a correction to that adjustment, and another adjustment was made. Right, and that adjustment could have been made because they put on an addition to their home. That adjustment could have been made because, in light of the wildfires, they did more research and they realized, oh, that number that I originally gave Allstate, that wasn't right. Now I take out a measuring tape and I'm going to tell them the correct measures. You know the square footage of your house? Have you ever measured it yourself? Nobody's going to know that. So that's why people respond to that by saying, I don't know the square footage of my house. That's why we're not suing Hilario, Your Honor. We're trying to figure out what the actual square footage is, and there's many sources for it, and no single one of them is determinative, but we can't figure out who, if anyone, was overinsured unless we know the actual square footage of their home. But they're not suing for being overinsured. They're suing for being overcharged, having to pay more than they would have otherwise. You keep putting the emphasis on overinsured because that's what Allstate potentially suffered, but they suffered not from overinsurance. And if she didn't have any claims, didn't suffer from underinsurance, she suffered from paying more than she would have paid otherwise. Where am I wrong? Because we file our rates with the California Department of Insurance, and the amount that they were charged corresponds to the amount of coverage that they received. There was nothing wrong with the premiums compared to the coverage that they received. But she didn't have any claims, so the extra coverage wasn't of value to her. What if they did? What about someone who had a claim? What if? But is there anything wrong with my conclusion that she paid more than she would have otherwise? If this lawsuit had never come along, if nobody had noticed the fact that the house was apparently mismeasured in the first place, she wound up paying more. As at least some policyholders did. Is that wrong? She never paid more money than the coverage that was provided, and the coverage that provided was never too high. If someone who, Your Honor says, paid more, paid more, and then they had a complete loss of their home during a wildfire, and Allstate paid out the full coverage limits, can she really come back here and say, I was injured because I paid too much? That person paid the correct premium, according to the rates filed with the CDI, for a certain amount of coverage and received the full amount of the coverage. So at all times they had the full coverage stated on the policy, disclosed on the policy. At all times they paid the premium for the coverage disclosed on the policy. And at all times the dimensions of their home were disclosed on the policy, and at all times they were advised to check them and to advise Allstate if there was any problems with them. With respect, counsel, you seem to be evading the question from my perspective. You've got, according to the class as defined by the district judge, you have a certain number of people whose agents recalculated how many square feet were involved. They thought an earlier mistake had been made. Allstate only recognized that, increased it for everybody. And that group, however many there were, 20,000 I think is the rough estimate now, paid more. And I don't think you're questioning that. You're saying, well, there would have been a fire and they would have benefited. Great, well, that's fine. But that's not what's before us here. The question is, given the mistake, did they pay more? And I think the answer is pretty clearly yes, right? Those people. Put Elario aside for a moment. Your Honor, people may have paid more money because of something completely unrelated to this. But they didn't do it. Allstate did or one of its agents did, right? No, Your Honor. We increased and then decreased. And then you increased again. No, we didn't. We did the opposite. We decreased and then we increased back. Right. And then your agents, some of the local agents, also increased before you had the increase on a system-wide basis, right? And those are the people that are included in this purported class. Isn't that right? But if they called in to increase because they realized they had an addition to their home or their dimensions changed or something, then there was no injury to them.  They never paid more premium to us. That's not the question here. The question is are there a certain number of people whose agents increased the amount of square footage because they recognized that the decrease was incorrect. Then Allstate on a blanket basis increased it. They paid more in premium than they otherwise would have. That's the claim. Now, it has to be proven, of course. But at least based upon the allegations, isn't that correct? They've suffered. No, Your Honor, it's not. Okay. And why is that? Because we do know, even if there is an agent who increased limits during this intervening period, we decreased, the agent increases, and then we increase back to where it was. That agent might have increased for reasons having nothing to do with this. And, in other words, our process put them- Like what would that have been? The house blew up or what? They added a room. They added an addition. They added a bathroom. Or they went back and looked at their records and realized that the original amounts that they gave to Allstate were wrong. So, yes, the agent made a change. But in that instance, the agent's change just was proper because it kept the status quo. We decreased and increased, putting back there, and the agent made another change that was unrelated. Okay. What relief are you seeking here? To dismiss the whole case or to send it back to the district court? To vacate the certification, Your Honor. That's the only relief we're seeking. And then, I mean, if a class were certified and we proved that Ms. Calario had no injury and she wasn't overinsured, I mean, that would be the end for the whole class because if she were typical, that would end the whole thing. We're asking for the class certification to be vacated so that we can, you know, figure out what did or did not happen with respect to Ms. Calario's claim. Okay. Other questions from one of my colleagues? Very well. Thank you. Thank you. All right. Thank you, Your Honors, and may it please the Court. My name is Richard McMillan-Sanchez, and I represent Plaintiff Appellee Tisha Calario in this case, and it's truly an honor to be here. I would like to touch on some of the concerns that the Court rightly touched on after hearing from Mr. Hanover. Centrally, as you've identified, the heart of this case is the damage suffered by Ms. Calario when Allstate overcharged her and thousands of others for insurance premiums based on fictitious garage sales. Counsel, again, I hate to bother your initial presentation. We don't have a lot of time, so I want to get right to the jurisdictional issue, which, of course, is essential. Yes, Your Honor. You're here under CAFA, if at all, right? Correct. So you have to show that the amount of controversy exceeds $5 million, right? Yes, Your Honor. Okay. So originally there was an allegation about 40,000 people were in the class. When the district redefined the class, the estimate dropped to around 20,000. Is that right? That's my understanding, Your Honor. Okay. Now, Ms. Calario alleges that she overpaid by $141. I believe that's in so many cents. When you multiply 20,000 times 141, do you get $5 million? What do you get? Your Honor, with all due respect to the math problem, I don't know if that adds up. The problem is here is there are persons who were overcharged in significantly greater amounts than that. While Ms. Calario's double counting may only have resulted in $120 to $140 overcharge, there are others who suffered greater multiples of twice-counted garage square footage, which did not exist. Do you agree you have the burden to show that you meet the $5 million threshold, right? Your Honor, that is certainly a requirement. Your jurisdiction is under CAFA, right? CAFA, that's correct. Okay. And what is your best argument that the redefined class meets that threshold? Well, the argument, Your Honor, is that there were tens of thousands of potential overcharges in amounts that may be far greater than what Ms. Calario suffered. Do you have any evidence that that's the case? Well, Allstate is actually in possession of the records, which show, at least in terms of reliable estimates, how much the overcharges do differ in false positives. Tell us a little bit about those. In other words, tell us why you meet the $5 million threshold. I'm struggling with how you do, and I want you to convince me otherwise if you can. Did Allstate give you any records that you could cite, too, like if you've got the average person in the $20,000 subclass suffered $10,000 worth of damages? Maybe we're talking about something, but are we talking peanuts, nickels, dimes? What are we talking about? Your Honor, to answer the first part of your question, Allstate has not produced a spreadsheet, for example, that has 20,000 cells which show estimated overcharges. What they have done, however, in terms of forecasting their potential financial losses as a result of the application of Project UIN is they have gone through policies and estimated the extent to which garage square footage overcharges did produce financial losses for them. That's page 1975 in the record. And how much is involved from their perspective, according to what you think? Certainly there's at least, at the very least, hundreds of dollars at issue per potential claimant. Now, granted, of course, we will have to go— Hundreds? You've got to make it a $5 million minimum threshold. You have the burden to show that. What is your best—just cite to the record. Where in the record do you show that you meet that standard? In terms of a specific page in the record, Your Honor, I'm not sure. What is important, though, is all the data that Allstate has looked at and observed. That doesn't help us. We're a court of appeal. We have to look at the record. If it's not in the record, it doesn't exist for purposes of this case. And where is it? I do understand that, Your Honor. Part of that is, throughout discovery, we've requested data from Allstate, not only supporting the application and the impact of Project UIN. They've only turned over so much because it's their entire contention that this is not really calculable. You can't make any ascertainable determination as to what the damages are, which one is belied by the fact that they have the record showing who was affected by the project, and they have the ability to determine and calculate the extent of those overcharges. Simply because they haven't produced, at this point, one single spreadsheet which shows, you know, this many thousands of dollars in premium increases or millions of dollars in premium increases are applicable doesn't mean that that threshold isn't met. It's just that Allstate, you know, is trying to hide behind the fact that they can't calculate this. Can you assign this to any Catholic case that would be analogous to what you're saying here, where the court has said that that meets the threshold requirement? At this moment in time, Your Honor, I cannot cite to a specific Catholic case. So is it fair to say there's a high question whether you have met the minimum threshold standard? Your Honor, I don't think that's necessarily true. I mean, yes, you are correct that, you know, Ms. Hilario's case involves a $120 overcharge directly as a result of Allstate's improper. That was $141, so. Well, right, and there's different spots in the record, right? And that's because, again, they're trying to hide behind their claimed inability to make these kinds of calculations. That's not important. But in the First Amendment class complaint, we do raise the issue that we're well above that million-dollar threshold, and Ms. Hilario has not only the standing, but we believe the ability to meet that threshold. It's just that because Allstate has tried to hide behind their claimed inability to. Again, with respect, I know you say that, but in your allegation, it's one thing to say, well, we're above the $5 million, but you've got to at least allege on a plausible basis how you get there. And that's what I'm struggling with. How do you get there? Sure, and we get there, Your Honor, by having up to 20,000 people who have, you know, at this point, not necessarily specifically known amounts of their overcharges. It's certainly possible that those amounts could meet that threshold, but until we are able to proceed. But at best, you're guessing, right? Your Honor, I don't know that it's fair to say that we're guessing. It's just that, again, Allstate has essentially obfuscated our ability to do the math problem with which the Court's concerned. Did it be remanded and let the district court make this decision before we get into it? I mean, Judge Siler, that is certainly one option for this court in terms of proceeding. That being said, I do think we've met the correct standard, and it's really at this point that Allstate has to acknowledge the fact that they've admitted wrongful conduct for which the class has been correctly certified and has to face an accounting for that. If they believe there's no liability or insufficient damages or anything like that, the remedy for them is to move for summary judgment and make that argument or to move to decertify the class. But we have to have jurisdiction first. As you well know, as a capable lawyer, the first question we always ask is, do we have jurisdiction? Absolutely. And I think, Your Honor, the district court is certainly capable of, you know, sua sponte, analyzing the data before it, the information before it, the testimony before it, and determining that standing is not an issue in this case, which we don't believe it is. They've not raised it before this court, at least in terms of the CAFA jurisdictional monetary amount issue. They've not raised that issue. The district court has not ascertained that as an issue. As you know, we, sua sponte, are required to raise those issues. We don't need them raised by the parties. Sure. And the other fact that I would point Your Honors to is not only is it just a raw amount of numbers of people who were overcharged in certain amounts that, again, we do believe could meet that threshold. The fact this is also can be multiplied by three for the number of years that this went on. The overcharging period went on for a number of years across tens of thousands of people in amounts that can be determined and could, by virtue of that, meet the threshold for CAFA. All right. But I didn't mean to interrupt you, but that's an important issue from our perspective. No, I appreciate it. And, you know, with the time that I have left, one other aspect of this case that I think really is important to clarify for Your Honors is when Allstate speaks to the actual square footage of Ms. Hilario's home, they also raise the fact that this is unpermitted construction. Now, they can't really have it both ways. They can't say, oh, this construction is unpermitted, and yet that should count against, you know, the amount of insurance coverage she should have had because what they don't tell you is that part of their estimated replacement costs includes permitting costs. If space is unpermitted, it cannot be permitted in a total loss and rebuilding scenario. So it doesn't really make sense for Allstate to say, oh, well, okay, the square footage number should have been higher and that they would then also rebuild this, quote, unquote, unpermitted space. They wouldn't do that. Moreover, there's no reason to believe that they would just count the built-in garage space that was added on improperly by Project UIN towards the unpermitted construction. That add-on is not a garage, and they keep track of that separately for a specific reason, and it defies logic to say that they would then go back after the fact post hoc and say, oh, this 288 square feet, that may not be for a garage, but we'll count that against your unpermitted construction. That doesn't make sense. And perhaps more importantly than that, even if Allstate had it their way and the square footage numbers had been actual or, quote, unquote, correct in terms of their framing, Project UIN still would have double-counted a built-in garage against that square footage, which they claim because that's the way their system works. That's how RCT4 works in terms of calculating the total living area that goes towards premiums, and that's also how Project UIN then tacked on an additional 288 square feet per built-in garage. The fact that this space may exist is wholly apart from what Ms. Hilario is claiming, that there was an inflation of insurance premiums by virtue of tacked-on garage space, which did not exist and which Allstate would not count against any other aspect of an individual person's home. And it's also important to highlight for this court that nothing has really changed in terms of Allstate's practices. To the extent that there are overcharges, which we believe the record demonstrates certainly a possibility, and in all likelihood that there was, that overcharging is still going on to this day. Allstate has done nothing in terms of redressing the problem, issuing refunds, or even notifying its customers that there was a problem in the first place. Now, again, this is another important aspect of the case. Did you allege that in your complaint? Yes, Your Honor. One of the key facets of what's going on here is what even caused Ms. Hilario to be on alert is she got a pre-renewal letter after Project UIN did the improper addition of garage space. That letter just says, oh, you know, your information may have changed, and it may have changed for these reasons. Allstate claims it's very difficult to write a letter that specifies what those changes are and the reasons for them, but it's really not. They just chose, and this is in the record, as a business decision not to send out a letter that explained the nature and basis for those changes. So, again, the only way that this class of persons who have been harmed by Project UIN's addition of 288 or multiples thereof in garage space is through continuation of this lawsuit. Otherwise, Allstate will never notify its customers. They will never send out a more specific pre-renewal letter than they did. Because it's very clear in the testimony of each of their witnesses at the point where they discussed that letter, they believe the letter is clear. They believe it's sufficiently transparent to say your policy may have changed, and it may have changed based on any one of these factors. Now, Your Honors, it would not be sufficient for me to present an argument to you and say our position is correct, and it may be because of these cases, and it may be because these cases might be applicable. That's not transparent, and for a consumer trying to understand why their insurance is going up and down and up and down, it certainly doesn't clarify why there's the issue, and it certainly does not alert them as to whether or not they should take out the tape measure and measure the walls of their home. It's not really a position that offers any sort of clarity and is, in fact, the basis for our UCL claim. It is a dishonest business practice to mislead customers in this way, and really all it is is an attempt to hide the fact that they did this to their consumers without regard to the negative possibility. Let me ask you this. If individual Allstate agents had not adjusted the square footage involved, would Allstate be at fault in doing what it did and adding back the, what was it, 280 square feet or something like that on the home based on their model? I mean, based on what occurred, I think that might be true, but that's also not the question before this court. I understand. I just want to understand. I know it's all the mode for plaintiff's lawyers to accuse insurance companies of horrendous things, but they're in business. They're trying to make a profit like anybody in business is, but it seems to me here that what happened is they thought they'd made a mistake. They thought they had corrected it, but for the actions of individual Allstate agents of which the main company may not have known at all, there wouldn't be a problem here. Is that correct? Sure. I mean, I think it's fair to say that because the square footage went down by one amount, if they had simply corrected it to that same amount, that might be net zero. That might be zero sum, but because that's not what happened here and because Allstate had the ability to know that that's not what happened here and implemented Project UIN anyway, that's really the heart of the case and why Ms. Hilario and thousands of others were damaged. Is Allstate the insurance company charged with the actions of its, I know they're called agents, but are they literally Allstate agents? I mean, as a matter of law, are they principal agent kind of thing? Does the principal bear the burden of what the agent does? I mean, I think just as an abstract principal, absolutely, but I think what's more important is at the time these adjustments were made, it's not as if, oh, me, Richard McMillan Sanchez, Allstate adjuster or Allstate agent, can just go in and write whatever I want to on a customer's square footage. At the time, it had to be submitted by agents or submitted by someone else within the company and then approved before that adjustment was actually applied. So insofar as that's true, these adjustments that were made, they would have had to have been submitted by Allstate agents and then approved on the back end by the company. So they would have actually had to have been reviewed as opposed to just a process? Yes, Your Honor, and that is actually in the deposition testimony for their 30B6 witness. They explain, and Jeff Thomas as well, they explain how that process works, that it wasn't just I could go in and write whatever I want because I think that's correct. Let me ask my colleagues whether either has additional questions for Allstate. No. I think not. Now, we used up the other gentleman's time as well, so unless either of my colleagues has additional questions, we will thank both of you distinguished lawyers for your presentation. I do have one. Judge Clifton has a question. I'd like to ask Mr. Hanover to speak to the jurisdictional concerns that have been raised. They haven't been raised previously. The answer acknowledges that the court has jurisdiction under the Class Action Act. What should we do about that? Jurisdiction depends on the allegations of the complaint. We don't think the allegations of the complaint are right. So we don't have an estimate of what the alleged injury is beyond what the complaint alleges, Your Honor. Are you bound by your concession of jurisdiction? We can't consent to federal jurisdiction exists or not. It's not a matter of consent. Are we bound by it? Excuse me? Are we, as a court of appeal, bound by it? You're not bound by any consent of the parties with respect to jurisdiction, Your Honor. Well, your answer says defendant admits the court has jurisdiction under the Class Action Fairness Act, period. That may not be the case from the perspective based on the questions that Judge Smith raised. So what do you suggest that we do about this? I understand you would like us to vacate the class, but if that's an issue we can't even reach until after we've ascertained whether we have jurisdiction, what do you suggest we do? Should we remand it to the district court so that the jurisdictional issue can be sufficiently defined or examined? Jurisdiction, at the time when a complaint is filed and a response is filed, jurisdiction turns on the allegations of the complaint. We admitted that based on the allegations of the complaint, there's federal jurisdiction. Based on what has been established in the litigation to date, the court has a duty to reexamine jurisdiction as the facts are developed. I'm not as familiar with the record, but it sounds like facts have developed to the point where there's at least some question as to whether there's jurisdiction under CAFA. Well, Your Honor, with respect to the facts that are developed, we don't think that there's damages or injury. We don't think there's filing. Well, that would suggest defendants always say the complaint's incorrect, we're not liable. But that doesn't lead to a conclusion. The federal court doesn't have jurisdiction. Jurisdiction is examined separately. It is subject to adjustment as the litigation unfolds. And so I'm asking you, what's all states' position at this point in time as to whether there's jurisdiction? And if there's a question about that, how should we proceed? Can I add just this amendment to my colleague's question? When the answer was filed, I assume there was the original allegation in the original class. The district court has now changed the definition of the class. If we assume arguendo that that is the new class, it basically cuts the class in half. What impact, if any, does that have on your answer to Judge Clifton's question? Well, so, Your Honor, that's more difficult to answer than it sounds because as we wrote in our appellate briefs, the district court did talk about 20,000 class members. We've scoured the record. We don't think there's any evidence to support that. We think that that finding in and of itself is an abuse of discretion. We're not sure what he was looking at, where it came from. It wasn't in any of the underlying briefs. We don't think there's anything near 20,000 policies that are affected. Well, let's assume for arguendo that there are 20,000 people that are affected. Your opposing counsel has suggested that all state has within its jurisdiction, within its paperwork, information that I believe he thinks would show that a number of people paid a whole lot more in excess premiums than $141. What's your response to that? Our records will show the number of policies for which Project UIN was run. That I know we can tell. There is a dispute. Do you yourself as an agent, do you have any indication of how much that was? I can't tell you standing here today, Your Honor. Okay. Other questions by my colleagues? All right, thanks to counsel. We appreciate the argument. The case just argued of Giladio v. Allstate Insurance is submitted. And the court is going to adjourn for the day. But I want to say to the students that our law clerks are going to meet with you while we go into conference, which is where we decide the cases. And then the judges will come out and chat with you as well. Thanks to counsel for being here. And the court stands adjourned.
judges: Siler, CLIFTON, SMITH